# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

PEDRO CORTES, *et al.*,          §
        Plaintiffs,          §
                  §
v.          §          CIVIL ACTION NO. H-07-2744
                  §
THE CITY OF HOUSTON and          §
HARRIS COUNTY, TEXAS,          §
        Defendants.          §


## MEMORANDUM AND ORDER

Pending before the Court is Plaintiffs' Request for a Preliminary Injunction [Doc. # 39] barring enforcement by Defendants of certain state laws and city ordinances. The City of Houston has responded [Doc. # 42]. The Court held a brief telephone conference on this matter on November 19, 2007, followed by an evidentiary hearing on November 20, 2007.[1] Upon review of the written submissions to the Court, testimony and oral argument presented at the hearing, all pertinent matters of record, and applicable law, the Court concludes that Plaintiffs' request should be **denied**.

---

[1]    At the November 19 telephone conference, attorneys for the City of Houston, Harris County, the State of Texas, and Plaintiffs participated. Plaintiffs previously dismissed the State from this case. *See* Order of Nov. 2, 2007 [Doc. # 37]. However, Plaintiffs' Request for a Preliminary Injunction seeks injunctive relief against the State. During the conference, Plaintiffs explained that their inclusion of the State in this matter was in error. Plaintiffs also agreed that the County, which stated that it does not intend to enforce the challenged legislation at this time, would not be subject to Plaintiffs' request for an injunction. Hence, neither the State nor the County were obligated to respond to Plaintiffs' motion.

## I.   BACKGROUND

Earlier this year, the Texas state legislature enacted new provisions aimed at regulating the operation of "Mobile Food Units" ("MFUs"), defined as "a vehicle-mounted food establishment that is readily moveable." 25 TAC § 229.162(60); *see also* TEX. HEALTH & SAFETY CODE ANN. § 437.001(4).   The statute relevant to the pending motion is Texas Health and Safety Code § 437.0074, which states, in pertinent part:

> (a)   A county with a population of at least 2.8 million, or a municipality or public health district in the county, shall require a mobile food unit to:
>
> > (1)   return to the food service establishment or commissary from which the unit operates within the 24-hour period preceding operation of the mobile food unit to have cleaning and other services performed on the unit; and
> >
> > (2)   obtain, on completion of an inspection following servicing, written documentation that the mobile food unit has been serviced daily as required by Subdivision (1).[2]

Pursuant to these provisions, the City of Houston amended its local ordinances governing the operation of MFUs, HOUSTON, TEX., CODE § 20-22—which has been in effect since 2000—on September 19, 2007, with such amendments to go into effect on

---

[2]   The Legislature also enacted Texas Health and Safety Code § 437.021, which requires that MFUs operating "in a county with a population of more than 3.3 million shall acquire written authorization from the owner of the property on which [the MFU] is operating."   Although Plaintiffs' written Request for a Preliminary Injunction seeks to enjoin enforcement of this provision as well, Plaintiffs' counsel withdrew this request during the November 19 telephone conference.

November 19, 2007.

Relevant to Plaintiffs' Request for a Preliminary Injunction are amendments to subsections (e) and (f),[3] which state, in pertinent part:

(e)     *Servicing of mobile food units by commissaries; servicing records.*

   (1)     **Servicing by commissaries.**  Mobile food units, other than restricted service mobile food units, shall operate from a commissary approved by the health officer and shall report to such location for supplies, cleaning, and servicing operations as follows:

* * * *

   c.     All other mobile food units shall return to the commissary for the performance of all servicing operations within the 24-hour period preceding operations.

* * * *

   (4)     **Servicing records to be kept by commissaries.**  The commissary from which a mobile food unit operates shall issue and maintain service records for each mobile food unit in a manner and form prescribed by the health officer. . . . .

---

[3]     The other amendments to § 20-22 require, *inter alia*, that certain MFUs obtain permission to operate on private property, HOUSTON, TEX., CODE § 20-22(c)(4), operate within five hundred feet of a flushable toilet, HOUSTON, TEX., CODE § 20-22(c)(5), and demonstrate "mobility" at "any reasonable time if requested by any peace officer or health officer," HOUSTON, TEX., CODE § 20-22(c)(7).  Plaintiffs' Request for a Preliminary Injunction includes a request to enjoin these provisions.  However, during the November 19 telephone conference, Plaintiffs' counsel clarified that Plaintiffs were only seeking an injunction barring enforcement of § 20-22(e).

(f)     *Commissaries.*

(1)   **Permitting of commissaries as food establishments.**  A commissary servicing any mobile food unit, other than a restricted service mobile food unit[,] shall be an approved and permitted food establishment at which the mobile food unit is supplied with fresh water, emptied of waste water into a proper waste disposal system, and cleaned, including washing, rinsing, and sanitizing of those food-contact surfaces or items not capable of being immersed in the mobile food unit utensil-washing sink.

* * * *

(4)   **Commissary serving area and operations.**

* * * *

b.     <u>*Servicing operations.*</u>

[1]   Potable water-servicing equipment shall be stored and handled in a way that protects the water and equipment from contamination.

[2]   The mobile food unit liquid waste retention tank, where used, shall be thoroughly flushed and drained during servicing operation. . . . .

[3]   Vehicle cleaning and in-place cleaning of nonfood-contact surfaces of equipment not requiring sanitization shall be done with potable water and shall be done in a manner that will not contaminate the vehicle's food storage or food preparation areas or equipment.  If hoses are used in the cleaning process, they shall be food-grade and kept off the floor or pavement, on racks . . . .

[4]    The use of liquid waste transport vehicles, otherwise known as vacuum trucks, for the removal and disposal of liquid waste resulting from mobile food unit operations is prohibited.

\* \* \* \*

[5]    Servicing operations may be performed by the commissary operator or by the mobile food unit operator. It shall be the commissary operator's responsibility to observe or perform servicing on each mobile food unit and properly complete a servicing record as prescribed by the health officer. It is the responsibility of the mobile food unit operator to confirm that the requirements of this section are fulfilled prior to resuming operations.

HOUSTON, TEX., CODE § 20-22(e), (f).

The amendments to subsections (e) and (f) make few substantive changes to the provisions previously in place. Required "servicing operations" remain identical. However, the amendments clarify that servicing is to occur within the "24-hour period preceding operations" rather than "daily" as was required under the old ordinance. In addition, the amendments place a duty on commissary operators to ensure that servicing operations—whether they be conducted by a commissary employee or by the MFU operator—are completed. *See* HOUSTON, TEX., CODE § 20-22 (as enacted prior to

Sept. 19, 2007).[4]

Plaintiffs, all of whom are Hispanic, operate MFUs in the City of Houston and/or Harris County. Plaintiffs assert that the state statutes and city ordinances noted above are "unduly vague" and "violate the Equal Protection Clause [of the 14th Amendment]."[5] Upon discovering that the City planned to begin enforcement of the amended ordinances on November 19, 2007,[6] Plaintiffs filed the pending request for injunctive relief. During the November 19, 2007 telephone conference, Plaintiffs' counsel stated that Plaintiffs were seeking to enjoin enforcement of subsection 20-22(e) of the Houston City Code, which Plaintiffs believed would require MFU operators to present themselves for daily inspections by the City. The November 20, 2007 hearing focused solely on this provision.

## II.   STANDARDS OF LAW

In determining whether to issue a preliminary injunction, the Court considers four factors: (1) whether the plaintiff has a substantial likelihood of succeeding on the merits; (2) whether there is a substantial threat of irreparable injury to the plaintiff in

---

[4]   Both the old and new versions of this ordinance were admitted into evidence at the November 20, 2007 hearing and are attached hereto because they are difficult to obtain in the public record.

[5]   *See* Plaintiffs' Second Amended Complaint [Doc. # 38], ¶¶ 1, 42.

[6]   *See* Plaintiffs' Request for a Temporary Injunction [Doc. # 39], Ex. A: "Letter to Plaintiffs' Counsel from the City Attorney."

the absence of an injunction; (3) whether the threatened injury to the plaintiff if the injunction is denied outweighs the threatened harm to the defendant if the injunction is granted; and (4) whether granting the injunction will disserve the public interest. *Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003); *Evergreen Presbyterian Ministries Inc. v. Hood*, 235 F.3d 908, 917–18 (5th Cir. 2000); *House the Homeless v. Widnall*, 94 F.3d 176, 180 (5th Cir. 1996); *Rodriguez v. United States*, 66 F.3d 95, 97 (5th Cir. 1995); *Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

The plaintiff bears the burden to establish the four factors. "Any injunctive relief is considered 'an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion.'" *Harris County v. Carmax Auto Superstores, Inc.*, 177 F.3d 306, 312 (5th Cir. 1999) (quoting *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989)) ; *see also Guy Carpenter*, 334 F.3d at 464; *Evergreen*, 235 F.3d at 917. "The primary justification for applying this remedy is to preserve the court's ability to render a meaningful decision on the merits . . . '[by] prevent[ing] the judicial process from being rendered futile by defendant's action or refusal to act.'" *Canal Auth.*, 489 F.2d at 573 (quoting WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2947). "Thus, only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits

can properly justify a preliminary injunction." *Id.*

The Fifth Circuit has endorsed the use of a "sliding scale . . . which takes into account the intensity of each [factor] in a given calculus." *State of Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975); *see also Fla. Med. Ass'n v U.S. Dep't of Health & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979).  However, "[n]o matter how severe and irreparable an injury one seeking a preliminary injunction may suffer in its absence, the injunction should not issue if there is *no* chance that the movant will eventually prevail on the merits." *Seatrain Int'l*, 518 F.2d at 180.  "Nor is there need to weigh the relative hardships which a preliminary injunction or the lack of one might cause the parties unless the movant can show *some* likelihood of ultimate success." *Id.*  "Obviously, it is inequitable to temporarily enjoin a party from undertaking activity which he has a clear right to pursue." *Id.*

## III.   <u>ANALYSIS</u>

During the November 19, 2007 telephone conference, Plaintiffs' counsel stated, *inter alia*, that he intended to demonstrate that a preliminary injunction barring enforcement by the City of § 20-22(e), as amended, was necessary to prevent irreparable harm to his clients.  Plaintiffs' counsel explained his intent to establish that the provision is violative of the equal protection clause of 14th Amendment because it impermissibly imposes requirements on the owners and operators of MFUs that are not

imposed on the owners of free-standing restaurants. Counsel further stated his intent to prove that the provision was unconstitutionally vague.   During the November 20, 2007 hearing, Plaintiffs offered testimony from two witnesses:   Juan Ramirez Hernandez ("Ramirez"), an MFU operator and Plaintiff in this action, and Estella Jimenez, a community activist and president of a local trade association for MFU operators.

Mr. Ramirez testified as to the various inspections that he was subject to prior to the September 2007 amendments to the City's ordinances governing MFU operations. Mr. Ramirez described annual "full" inspections that require him to present his MFU to a City inspector, who checks for, *inter alia*, gas leaks, electrical problems, and sanitation issues.  He stated that MFU operators are also required to demonstrate proof of insurance.  According to Mr. Ramirez, a satisfactory inspection is required in order for an MFU operator to receive a business permit.  Mr. Ramirez also described "spot" inspections, which occur every two to three months at each MFU's ordinary place of business.[7]   During these three- to four-hour inspections, a City inspector checks the cleanliness of the MFU and ensures that the unit is not infested with insects

---

[7]     Although MFUs are mobile, they regularly operate at the same site(s) and must provide a route list and itinerary to the Houston Department of Health and Human Services.  *See* HOUSTON, TEX., CODE § 20-22(c)(3).

or rodents.[8]

Mr. Ramirez also described his daily trips to a local "commissary" where he disposes of waste water, trash, and grease, and fills his unit's water tanks with fresh, potable water.  Upon completion of these tasks, Mr. Ramirez receives a receipt from a commissary employee confirming that the unit was serviced.  Mr. Ramirez testified that he has been in business since 2001, during which time he has faithfully visited the commissary daily.  He stated that the $11 charge to service his unit is somewhat burdensome and that his trips to the commissary are time-consuming.  However, he offered no persuasive evidence that these trips seriously hurt his business.  Mr. Ramirez further acknowledged the importance of maintaining the cleanliness of his MFU and preventing improper disposal of waste and stated his belief that the laws in place before the September 2007 amendments were sufficient to protect public health.  Mr. Ramirez also stated that all of the MFU operators he encounters at the commissary he frequents are Hispanic.

Mr. Ramirez testified that, under the amended ordinance, he expects to be subject to rigorous daily inspections, akin to a "spot" inspection.  Mr. Ramirez further testified to his belief that failure to comply under these "new" inspections would

---

[8]     It was not clear from the testimony whether the MFU is able to sell food during these on-site inspections.

subject him to very large fines that could force him out of business.   However, Mr. Ramirez admitted that he has only read some of the ordinances regulating MFUs and has received information concerning the amended provisions primarily from the president of a local organization of MFU operators, Estella Jimenez.

Ms. Jimenez, a former MFU operator, testified that she is working to organize local MFU operators to lobby for more favorable statutory requirements governing MFU operations.  She leads a group known as the National Association of Mobile Taquerias, whose members are all Hispanic.  Ms. Jimenez stated that she is concerned about the City's treatment of MFUs in comparison to free-standing restaurants.  She further testified to her belief that the amended City ordinances will require MFUs to present themselves to commissaries for daily inspections.  According to Ms. Jimenez, these would be so time-consuming as to force MFUs out of business.  However, Ms. Jimenez admitted that she has not read the ordinances governing MFUs and has obtained much of her information about the supposed effect of the amendments from Plaintiffs' attorney.

The City then offered testimony from Conrad Janus, the acting head of Consumer Health Services for the Department of Health, who oversees the Specialized Inspection Group, which regulates MFUs and restaurants.  Mr. Janus explained that under the old version of § 20-22(e), MFU operators were required to visit a commissary "daily."

Because of this, MFU operators could avoid going to the commissary unless or until a City inspector requested verification of a visit.  By telling the inspector that they planned to go to the commissary at the end of the day, MFU operators were technically in compliance with the letter—if not the spirit—of the law.  By amending the ordinance to require a commissary visit "in the 24 hours preceding" operation, Mr. Janus explained that MFU operators should now be able to provide proof of compliance anytime they are operating their business.  According to Mr. Janus, this ordinance is intended to ensure that MFUs are clean and that waste is properly disposed of.[9]

Mr. Janus testified that the amendments do not require any kind of daily City "inspection" of MFUs.  Instead, the amendments place a duty on commissary operators to ensure that cleaning operations are completed before MFU operators are given a receipt acknowledging their visit.[10]  Mr. Janus noted that the City was provided funding for two additional health inspectors, but explained that two positions had been cut in a previous year's budget.  Thus, these inspectors would be hired, not to conduct new daily inspections of MFUs, as Plaintiffs contend, but merely to improve the Health Department's inspection capabilities overall.[11]

---

[9]   *See* Transcript of the November 20, 2007 Preliminary Injunction Hearing ("Transcript") [Doc. # 44], at 51, 93–96.

[10]   *Id.* at 56–59.

[11]   *Id.* at 91–93.

A.       **Substantial Likelihood of Success on the Merits**

1.       **14th Amendment – Equal Protection**

Under the Equal Protection Clause of the 14th Amendment, different standards of review are applied depending upon the right or classification involved.  *Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993).

> Whether a claim made under the equal protection clause . . . will be successful depends critically on the standard of review that is applied to the state action complained of by the plaintiff.  Classifications created by state action which disadvantage a "suspect class" or impinge upon the exercise of a "fundamental right" are subject to strict scrutiny, and will be upheld only when they are precisely tailored to serve a compelling state interest.  Classifications that disadvantage certain other groups, such as women, are subject to an intermediate level of scrutiny, and will be upheld only when they are shown to further a substantial interest of the state.  Outside these categories, equal protection claims are analyzed under the rationality test.  Under the rationality test, the state action need only bear a rational relationship to a legitimate state interest in order to be sustained.

*Clark v. Prichard*, 812 F.2d 991, 995 (5th Cir. 1987) (internal citations omitted).

Plaintiffs' Second Amended Complaint [Doc. # 38] and testimony elicited during the November 20 hearing make clear Plaintiffs' contention that § 20-22(e), as amended, impermissibly classifies on the basis of ethnicity.[12]  However, Plaintiffs have offered

---

[12]     *See* Plaintiffs' Second Amended Complaint [Doc. # 38], ¶¶ 14 ("The City of Houston [has] enacted laws that directly affect the commerce and likelihood of the principally Hispanic owners and workers of and in Mobile Food Units . . . ."); 15 ("[The] Houston City Council [has] enacted . . . laws that restrict commerce and discriminate against the Hispanics that earn a living in MFUs."), 22 ("These statutes represent the intent of the Texas Legislature to

insufficient evidence to demonstrate a substantial likelihood of succeeding on this theory.

"In many, if not most, equal protection cases, the classification to which the plaintiff objects is explicitly set out in the legislation under which the state acts.  By using standards, qualifications, or criteria to control the scope and applicability of the legislation, the legislation itself classifies." *Mahone v. Addicks Utility Dist.*, 836 F.2d 921, 932 (5th Cir. 1988).  The ordinance at issue does not, on its face, make any classifications based upon the racial or ethnic background of MFU operators.  Plaintiffs, recognizing this, rely on the Supreme Court's decision in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), to argue that because—according to Plaintiffs—MFU operators are predominantly Hispanic, the City ordinance unconstitutionally imposes burdens on Hispanics that are not placed on members of other ethnic groups.[13] Plaintiffs' reliance on *Yick Wo* is misplaced.

It is true that "equal protection of the law requires not only that laws be equal on their face, but also that they be executed so as not to deny equality." *Mahone*, 836 F.2d at 932 (citing *Yick Wo*, 118 U.S. 356).  In *Yick Wo*, a facially non-discriminatory

---

discriminate against the MFU owners and workers; almost all of whom are of Hispanic descent.").

[13]    *See id.* ¶¶ 22–25.

city ordinance was found to violate the equal protection clause when, in application, it became clear that the statute was enacted for a discriminatory purpose. *Yick Wo*, 118 U.S. at 374. The statute at issue prohibited laundries from operating in San Francisco unless the operator received permission from the Board of Supervisors or operated in a building constructed of brick or stone. *Id.* at 368. The Court found that the Board permitted laundries to be operated in wooden buildings when the business owner was Caucasian, but denied similar approval to all Chinese operators. *Id.* at 373.

In this case, Plaintiffs' have offered no evidence that the City has enforced in the past, or intends to enforce in the future, § 20-22(e) differently based on the race or ethnicity of an MFU operator.   In addition, even if it is true, as Plaintiffs contend, that "most MFUs are operated by Hispanics,"[14] it does not follow that the statute is

_____

[14]   Plaintiffs, in their Second Amended Complaint [Doc. # 38], request that the Court take judicial notice of "the fact that most MFUs are operated by Hispanics by driving around the city."   This an inappropriate use of judicial notice.   "Rule 201 of the Federal Rules of Evidence provides that a court *may* take judicial notice of an "adjudicative fact" if the fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned." *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829 (5th Cir. 1998). The Court seriously questions Plaintiffs' position that an individual can be deemed to be "Hispanic" based solely on his or her appearance. *See* U.S. Census Bureau, Population Div., Special Population Staff, *Racial & Ethnic Classifications Used in Census 2000 and Beyond* (Apr. 12, 2000), http://www.census.gov/population/www/socdemo /race/racefactcb.html. ("People of Hispanic origin may be of any race . . . including White, . . . African American, American Indian . . . , Asian, [or] . . . Pacific Islander."); *see also Salas v. Wis. Dep't of Corr.*, No. 05-C-399-C, 2006 U.S. Dist. LEXIS 21140, *19 (W.D. Wis. Apr. 17, 2006) ("[I]ndividuals of Hispanic origin may have skin tones that range from dark to fair . . . ."). Thus, the Court declines to indulge this request.

necessarily unconstitutional.  Ever since the Supreme Court decided the seminal case of *Washington v. Davis*, 426 U.S. 229 (1976), it has been axiomatic that legislation does not offend the Constitution merely because it may, or does, have a disparate impact on members of a certain racial or ethnic group.  Instead, it must be shown that the legislation was enacted for a "racially discriminatory purpose." *Id.* at 240.  Only "[o]nce racial discrimination is shown to have been a 'substantial' or 'motivating' factor' [behind enactment of a statute, does] the burden shift[] to those supporting the government action to show that the same course would have been pursued absent the discrimination."  *Walker v. City of Mesquite*, 402 F.3d 532, 535 (2005) (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)).

In this case, Plaintiffs' counsel asserts that state legislators amended § 20-22(e) for a racially discriminatory reason and are motivated by a "racist agenda."[15]  Plaintiffs in fact produced no supporting evidence for this inflammatory proposition.  Plaintiffs thus have failed to demonstrate that this ordinance was intended to, or in fact does, classify regulated and unregulated parties on the basis of race or ethnicity.  Therefore, "[s]ince this case does not concern a suspect or quasi-suspect classification such as race or sex, to which heightened scrutiny is given, the equal protection clause requires only a minimum degree of rationality." *Reid v. Rolling Fork Public Utility Dist.*, 854

---

[15]     Transcript [Doc. # 44], at 108.

F.2d 751, 754 (5th Cir. 1988) (citing *City of Cleburne v. Cleburne Living Center, Inc.*,

917 U.S. 432, 439–42 (1985)); *see also Mahone*, 836 F.2d at 934 n.12.

"Applying the legislative model, an equal protection violation does not arise if

there is any basis for a classification or official action that bears a debatably rational

relationship to a conceivably legitimate governmental end." *Reid*, 854 F.2d at 754

(citing *Shelton v. Coll. Station*, 780 F.2d 475, 482 (5th Cir. 1986); *Stern v. Tarrant*

*County Hosp. Dist.*, 778 F.2d 1052, 1056 (5th Cir. 1985)). In fact, "[a]s long as there

is *a* conceivable rational basis for the official action, it is immaterial that it was not *the*

or *a* primary factor in reaching a decision or that it was not *actually* relied upon by the

decisionmakers or that some *other* nonsuspect irrational factors may have been

considered." *Id.* (citing *Mahone*, 836 F.2d at 934; *Shelton*, 780 F.2d at 481–82)

(emphasis in original); *see also Stern*, 778 F.2d at 1056 ("In equal protection terms, if

the legislative purpose be legitimate, a challenge may not prevail so long as the

question of rational relationship [to legislative purpose] is at least debatable."). "The

general rule is that legislation is presumed to be valid . . . ." *City of Cleburne*, 473 U.S.

at 442. "[W]here individuals in the group affected by a law have distinguishing

characteristics relevant to interests the State has the authority to implement, the courts

have been very reluctant . . . to closely scrutinize legislative choices as to whether,

how, and to what extent those interests should be pursued." *Id.*

To the extent Plaintiffs are challenging the City ordinance on the ground that it impermissibly distinguishes between MFUs and free-standing restaurants, Plaintiffs have clearly failed to show that such a challenge will succeed.  The power of the state to enact health and safety legislation is expansive, *see Romer v. Evans*, 517 U.S 620, 632 (1996) (gathering cases), and the Court's inquiry is confined to whether the City's decision to regulate MFUs differently from free-standing restaurants conceivably could be related to a legitimate government purpose.  *See Women's Med. Ctr. v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001).  Based on the evidence presented thus far in this case, the Court is satisfied that the City Council could conclude that MFUs, which have neither any physical connection to a plumbing system, nor obvious grease and waste disposal facilities, pose a unique threat to public health and that § 20-22(e) is rationally designed to minimize that risk.

Thus, Plaintiffs have failed to demonstrate a substantial likelihood of success in proving that § 20-22(e), as amended, violates the equal protection clause of the 14th Amendment.[16]

---

[16]    To the extent Plaintiffs complain that this ordinance is based upon state law that impermissibly applies only to MFUs operating in "[a] county with a population of at least 2.8 million," TEX. HEALTH & SAFETY CODE ANN. § 437.0074, the Court notes that dozens of state laws target cities and counties in this manner, including at least one that also applies to free-standing restaurants.  *See* TEX. HEALTH & SAFETY CODE ANN. § 437.0074(a) ("A county with a population of at least 2.8 million may require a trained food manager to be on duty during the operating hours of a food establishment.").  "It is well-settled that 'as long as a classification is rationally related to a legitimate state objective, a legislature is allowed to attack a

### 2.     Void-for-Vagueness

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (collecting authority).  "A statute is unconstitutionally vague if it does not give 'a person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Groome Resources, Ltd. v. Parish of Jefferson*, 234 F.3d 192, 217 (5th Cir. 2000) (quoting *United States v. Bird*, 124 F.3d 667, 683 (5th Cir. 1997)).

"The void-for-vagueness doctrine has been primarily employed to strike down criminal laws." *Id.* (citing *Okpalobi v. Foster*, 190 F./3d 337, 358 n.10 (5th Cir. 1999)).  "In the civil context, 'the statute must be so vague and indefinite as really to be no rule at all.'" *Id.* (quoting *Boutiller v. INS*, 387 U.S. 118, 123 (1967)). Moreover, "[e]ven if the outermost boundaries [of a statute] may be imprecise, any such uncertainty has little relevance [where a litigant's] conduct falls squarely within the 'hard core' of the statute's proscriptions." *J&B Entm't v. City of Jackson*, 152 F.3d 362, 368 (5th Cir. 1998) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973)); *see also Fernandes v. Limmer*, 663 F.2d 619, 636 (5th Cir. 1981) (quoting *ISKCON*

---

perceived problem piecemeal.'" *Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 389 (5th Cir. 2001) (quoting *Jackson Court Condominiums, Inc. v. New Orleans*, 874 F.2d 1070, 1079 (5th Cir. 1989); *see also Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966). Thus, the Court finds that any challenge to the constitutionality of § 20-22(e) premised on this argument is also unlikely to succeed.

*v. Eaves*, 601 F.2d 809, 830 (5th Cir. 1979)) ("'We can never expect mathematical

certainty from our language.'  The minimal ambiguity presented in [the challenged

statutes] is well within constitutional limits.").

In determining whether a statute is unconstitutionally vague, courts look, *inter*

*alia*, to whether the statute "provide[s] definite standards for those who apply them."

*Beckerman v. Tupelo*, 664 F.2d 502, 511 (5th Cir. 1981).  Such standards may be

found on the face of a statute or by reference to other authority that has defined

otherwise ambiguous terms.  *See, e.g., J&B Entm't*, 152 F.3d at 368 (rejecting a void-

for-vagueness challenge by noting that the language at issue—"serious literary, artistic,

scientific, or political value"—has been "subject of a plethora of opinions handed down

by state and federal courts throughout this nation in the quarter century since" they

were introduced by the Supreme Court in its test for "obscenity"); *see also*

*Basiardanes v. City of Galveston*, 682 F.2d 1203, 1210 (5th Cir. 1982) (Where an

ordinance is not vague as applied to a litigant, the litigant may proceed on its facial

vagueness challenge only if the ordinance's effect on—in this, as in most vagueness

cases—first amendment rights "is real and substantial and the language of the

ordinance is not readily subject to a narrowing construction by state courts.").

Moreover, "economic regulation is subject to a less strict vagueness test because its

subject matter is often more narrow, and because businesses, which face economic

demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.  Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 498 (1982).  Courts have also "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* (collecting authority).  "And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Id.*

In this case, Plaintiffs did not offer evidence that § 20-22(e) is unconstitutionally vague.  The City's testimony and both the old and amended versions of § 20-22(e) establish clearly that Plaintiffs have no substantial likelihood of success on this theory.  The only meaningful change to the ordinance is the requirement that MFU operators visit a commissary in the "24 hours preceding" operation, rather than "daily," as was previously required.  There is nothing vague about this requirement.  Plaintiffs have been subject to the remaining requirements of § 20-22(e) since 2000 and no evidence was presented to suggest that Plaintiffs have been unable to ascertain the requirements to which they have been subject for the last seven years.

Thus, Plaintiffs have failed to demonstrate a substantial likelihood of success on

either of their equal protection or void-for-vagueness challenges to § 20-22(e).

### B.  Substantial Threat of Irreparable Injury

_____ "[T]hat [a plaintiff] is unable, in an abbreviated proceeding, to prove with certainty eventual success does not foreclose the possibility that temporary restraint may be appropriate" where there is an adequate showing of threatened injury.  *Seatrain Int'l*, 518 F.2d at 180.  Plaintiffs, however, have failed to demonstrate that an injunction is necessary to prevent them from suffering irreparable harm.

Plaintiff Juan Ramirez's conclusory testimony that he could be put out of business if § 20-22(e) is enforced was premised on a patent misunderstanding that the amended ordinance will require new daily "full inspections" of MFUs.  MFU operators have been subject to the requirements of § 20-22(e) since 2000.  The Court finds that the 2007 amendment to the ordinance will not cause any injury to those operators previously in compliance with the law.  Indeed, to the extent that Plaintiffs' argument is that the ordinance as amended poses a threat of harm because it no longer allows for easy evasion of its "commissary visit" requirement, the Court is unsympathetic.[17]  On the other hand, if Plaintiffs' argument is premised on a misunderstanding of the law, the

---

[17]  *See* Plaintiffs' Second Amended Complaint [Doc. # 38], ¶ 40 ("Additionally, some of the MFU's [sic] travel to outlying areas of the county and do not return to the commissary on a daily basis.  So for them to have to return to the commissary on a daily basis works greater hardship upon these individuals.").

City's explanation of the effect of the amendment should allay many of Plaintiffs' concerns.  Finally, Plaintiffs' contention that the "servicing process" required under the amended ordinance "has or will soon . . . devolve into an all-out inspection for the purpose of putting [MFU operators] out of business"[18] finds no support in the record. This assertion is pure speculation and accordingly, is an inappropriate ground upon which to grant a preliminary injunction.

Thus, the Court is unpersuaded that Plaintiffs face irreparable injury should an injunction be denied.

## C.    <u>Balancing of Hardships</u>

The parties offered little evidence on the third factor of the preliminary injunction analysis:  whether "the threatened injury to [Plaintiffs] outweighs the potential injury posed by an injunction to [Defendants]."  *Guy Carpenter*, 334 F.3d at 464.  Based on the foregoing analysis and the entire record, the Court finds that the threat of harm to Plaintiffs from enforcement of § 20-22(e), as amended, is *de minimis* and that Defendants, as representatives of the electorate, have a strong and valid interest in enforcing this health and safety law.  The balance of hardships does not tip in Plaintiffs' favor.

---

[18]    Transcript [Doc. # 44], at 107.

D.     **Public Interest**

Finally, the Court finds that, given the paucity of evidence counseling in favor of an injunction, granting the injunction would disserve the longstanding and clear public interest in ensuring that eating establishments are sanitary and that waste is properly disposed of.  *See, e.g.*, *Ex parte Baker*, 127 Tex. Crim. 589, 595 (1934) ("A city or town may under its police power make and enforce within its limits any traffic, sanitary, or  health regulations which are not in contravention of the organic law of the land . . . ."); *Tomassi v. San Antonio*, 268 S.W. 273, 274 (Tex. App.–San Antonio 1924, writ ref'd) ("In every case brought to the notice of this court, in which regulation of markets . . . was involved, the right of the city to pass and enforce ordinances reasonably calculated to protect the citizen in the purchase of sanitary food has been upheld . . . .").  Thus, Plaintiffs have not satisfied this factor of the preliminary injunction analysis.

IV.   <u>**CONCLUSION**</u>

For all the foregoing reasons, Plaintiffs have failed to demonstrate entitlement to the extraordinary relief of a preliminary injunction.

The testimony and oral argument presented by Plaintiffs and counsel at the November 20 hearing suggest that Plaintiffs actually seek legislation permitting or

requiring the City's use of mobile "vacuum trucks" to service MFUs.[19]  Apparently,

these trucks can travel to the site where an MFU operates and can clean and dispose

of an MFU's waste.  Plaintiffs' witnesses testified that use of such trucks would limit

the time and effort it takes for MFU operators to make daily trips to the commissary

and, by implication, would be favorable to their business interests.  The Court is

sympathetic to the inconvenience that the required commissary visits impose.  There

can be no doubt that operating a business is challenging—especially a food service

business subject to serious state regulation.  However, absent proof that legislation runs

afoul of the Constitution, the Court has no authority to enjoin enforcement of laws,

even if the provisions are perceived to be ineffective or misguided.  *See, e.g.*, *Women's

Med. Ctr.*, 248 F.3d at 419.  The Court's inquiry is limited to whether the classification

at issue rationally serves the general purpose identified by lawmakers.  *Id.*  "Whether

the court agrees with the accuracy of the line of demarcation drawn by the Legislature

to distinguish the classification is of no great moment."  *Id.*  Plaintiffs must, and should,

resort to the political process to address their concerns.

It is therefore

**ORDERED** that Plaintiffs' Request for a Preliminary Injunction [Doc. # 39] is

**DENIED**.  It is further

---

[19]     *See id.*, at 27–28, 32–33, 108–109.

**ORDERED** that Plaintiffs' counsel is to have this Memorandum and Order, and each of the attached exhibits, translated—in writing—into Spanish.  Both the Spanish and English versions are to be distributed to each Plaintiff no later than **January 31, 2008**.  Plaintiffs' counsel is responsible for the accuracy of the translation.

SIGNED at Houston, Texas on this **13th** day of **December, 2007**.

Nancy F. Atlas
United States District Judge